UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ANTOINE DORAN,

                              Petitioner,

    -against-

                                            **MEMORANDUM & ORDER**

BRIAN FISCHER, Superintendent,                              06 CV 3638 (RJD)
Sing Sing Correctional Facility,

                              Respondent.
----------------------------------------------------------------X
DEARIE, Chief Judge.

      Petitioner Antoine Doran, currently serving a twenty-three year sentence for his conviction, after trial, of second-degree attempted murder and second-degree possession of a weapon, seeks a writ of habeas corpus under 28 U.S.C. § 2254. For the reasons set forth below, the application is denied and the petition is dismissed.

## BACKGROUND

A.    <u>Petitioner Claims Self-Defense at Trial</u>

      Testifying is support of his claim of self-defense, petitioner admitted that while Elevon Laramore was just outside the front of the Laramore home, at approximately 4:30 p.m. on May 1, 2000, he fired three shots toward Laramore at close range. It is undisputed that the shooting put Laramore's life at risk, that one of the bullets entered Laramore's chest resulting in permanent partial paralysis, and that Laramore also exhibited a second wound on his back. Strongly disputed at trial, however, and the principal focus of petitioner's overlapping claims here, is whether the victim's back wound resulted from the *exit* of the bullet that entered his chest, or

instead from the entry of a *second* bullet. The latter, according to the prosecution, foreclosed a claim of self-defense.

The theories of both the prosecution and the defense drew upon the history of hostilities between the Laramores and the Bakers, two families who, living across the street from each other, regularly took their disputes to that street. Guns, baseball bats and arrests were common. The state cast petitioner's shooting of Laramore as the latest episode in this feud; there was evidence that petitioner sought out Laramore in specific retaliation for the verbal mistreatment of Chattie Baker (his girlfriend) by one of the Laramores earlier that day. Petitioner, however, specifically denied that he sought out Laramore, testifying that he was in possession of a gun that a friend had lent him and that he was on his way to return it when he happened upon Laramore. Conceding that the encounter was antagonistic, petitioner testified that it was Laramore who first began to reach for a weapon, and that he (petitioner) then had to use the gun he was carrying to protect himself. No guns were recovered, although police did find three shell casings at the scene.

B.  The Bullet Evidence and Arguments

James Becker, the paramedic who responded to the scene, was qualified by the trial court without objection from the defense as an "expert in the identification and treatment of gunshot wounds" (119). Becker testified that Elevon exhibited "an entrance on the right shoulder and an exit in approximately the midline of the back from a gunshot wound" (128).

The prosecution also called Dr. Chukuma Okadigwe, the surgeon who treated the victim nearly 24 hours later and who was also qualified, without objection, as an expert "[i]n the identification and treatment of gunshot wounds" (307). Asked "how many different gunshot

-2-

wounds [he] observe[d] when [he] treated Mr. Laramore," Dr. Okadigwe replied, "[t]wo," one "in the front" and the "other one . . . in the back" (311). The prosecution did not ask Dr. Okadigwe whether the injury to Elevon's back was an exit or entrance wound, but did ask "hypothetical[ly]" whether the injuries he observed "were consistent with the victim facing the sho[o]ter and being shot the first time in the chest and then turning and being shot in the back" (318). Dr. Okadigwe replied that "[i]t is possible" and that "[a]nything is possible" (318-19).

The defense did ask Okadigwe directly whether the injury to Elevon's back was, in his opinion, an exit or entrance wound, but the doctor replied that he "c[ould]not tell" (319). Okadigwe also acknowledged that in his experience he had "come across cases where bullets have entered bodies as a result of a ricochet" (319). Neither the prosecution nor the defense asked either Becker or Okadigwe whether any bullet was found in Elevon's body.

In summation, the prosecutor argued without qualification that petitioner shot the victim in the back: "What else does [petitioner] need to explain? He needs to explain how, how in the world it's self-defense when Mr. Laramore was shot in the back" (651).[1] In support of his argument, the prosecutor recast the content and import of Becker's and Okadigwe's opinions, telling the jury that, "the EMT is the expert in gunshot wounds" and that "the EMT told you there were specifically two gunshot wounds, one to the chest and one to the back," and urging that the EMT was "the best person qualified" to describe "where [the victim] was shot" because he "treated him at the scene," whereas Dr. Okadigwe did not see the victim until "almost the next day" (653).

---

[1] Petitioner interrupted the prosecutor at this point, shouting, "That's not true, "and was appropriately warned by the trial court that a subsequent outburst would lead to his removal from the courtroom (652).

C.  The Victim's Testimony

Before the shooting, the day was already marked by substantial Laramore-Baker violence. Laramore had fought with Devon Baker who, during the clash, had struck Laramore in the head with a baseball bat. Afterward, when Laramore was returning from the hospital where his head was stitched, gunshots were apparently fired by the Bakers' mother (Roxanne) across the street toward the Laramores' mother (Vonceil Laramore). Shortly after that, when Laramore was re-exiting his home to file a police report against Devon Baker for the bat attack, Laramore first noticed petitioner across the street talking to the Bakers.[2]

Due to his own earlier act of violence—a knife-stabbing of Devon Baker to which Laramore had pled guilty—Laramore was himself still on probation at the time he testified at petitioner's trial.

According to Laramore, he was unarmed and inside his gate when petitioner approached him, asked, "which one of you have [sic] a problem with my baby mother," pulled out a gun from under his coat, and shot him once. He testified that the following then occurred:

> Q. And how soon did [petitioner] fire this first shot after you walked out that front door?
> A. I guess as soon as he saw me.
> . . .
> Q. . . . after [petitioner] fired that first shot . . . what happened?
> A. He paused.
> Q. What happened to the first shot?
> A. He shot me, he paused, and he shot me again.
> Q. Tell us where he shot you.
> A. He shot me in the chest and he shot me in the back.
> Q. . . . After you were shot the first time, what did you do . . . ?
> A. Turned around and reached for the door.

---

[2] Three months earlier, Laramore had stabbed Devon Baker; he eventually pled guilty and was still on probation at the time of petitioner's trial.

>   . . .
>   Q. Did you ever get inside your house?
>   A. No.
>   Q. What happened after you reached the door, what happened next?
>   A. I got shot again.
>   Q. That was the second shot?
>   A. Yes.
>   . .
>   Q. And that second shot, where did it hit you?
>   A. The second one hit me in my back (201-202).

Laramore was still standing after the first shot, but fell after the second, and did not remember what happened after the third shot (203-204).

Laramore's mother, girlfriend, brother, and brother's friend all witnessed the shooting and corroborated his account. Several Bakers apparently also witnessed the shooting but were not called either by the state or petitioner.

## DISCUSSION

### I. The Prosecutorial Misconduct Claim

Petitioner claims he was denied a constitutionally fair trial because the prosecutor misrepresented the state of the bullet evidence. He also claims that the prosecutor made highly inappropriate remarks during summation. Among other things, the prosecutor questioned why jurors would be willing to credit the "lowly word of defendant" (638), remarked that petitioner's claims "don't mean a pile of spit" (655), suggested that because petitioner had a child to support but did not have a job, he must be generating an income through illegal activity (518-19), argued that petitioner's failure to return on $50,000 bail in another, unrelated matter was indicative of his poor character (639-40), and declared that there were "50,000 reasons not to believe"

petitioner (639).

These claims were rejected by a unanimous panel of the Appellate Division. People v. Doran, 10 A.D.3d 425 (2d Dep't 2004), lv. app. denied, 3 N.Y.3d 739 (Oct. 7, 2004). The Appellate Division found the claims to be "largely unpreserved for appellate review" because petitioner had "failed to object in a number of instances to the alleged prosecutorial misconduct, or [had] made only general objections, and failed to request curative instructions in instances where the trial court sustained his general objections." Doran, 10 A.D.3d at 425. The Appellate Division further concluded that, "[i] any event, the challenged remarks and conduct, both individually and cumulatively, constituted harmless error in light of the overwhelming evidence of [petitioner's] guilt." Id.

A petitioner seeking habeas relief because of remarks of a prosecutor bears a high burden. Under settled Supreme Court law, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden v. Wainwright, 477 U.S. 168, 180 (1986). Rather, they justify habeas relief only if they are "egregious" and "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).

Petitioner's complaints about the prosecution's handling of the bullet evidence are not unfounded. Because the law distinguishes between evidence and argument and assigns each a place at trial, and because even prosecutors are afforded substantial latitude in harvesting the most opportune account that the evidence supports, we are reluctant to find serious fault with what formally falls into the category of zealous argument. Nonetheless, here, we readily agree that many of the prosecutor's remarks were inappropriate.

The prosecutor's manipulation of the bullet evidence, we find, lapsed into misrepresentation. For while there was nothing ambiguous, provisional, or negotiable about EMT Becker's expert opinion, which referred to wound*s* in the plural but gunshot in the singular, the prosecutor's summation plainly misconstrued Becker's words, making them sound like support for the theory that petitioner shot Laramore in the back:

> the EMT is the expert in gunshot wounds, the EMT told you there were specifically two gunshot wounds, one *to the* chest and one *to the* back. Doctor Okadigwe sees him after his clothes are off, he sees him almost the next day. Who is the best person qualified as to where he was shot? The EMT who treated him at the scene (653)

That the prosecutor specifically urged jurors to place *more* weight on Becker's testimony than on Dr. Okadigwe's is puzzling, given that Okadigwe also testified that there were two wounds and that it was Okadigwe who had at least conceded the possibility that the wounds were consistent with the prosecutor's theory, whereas that possibility was not even broached with Becker, whose opinion is plainly inconsistent with that theory.[3] (The prosecutor's opening was even more inconsistent with the evidence: there, he promised jurors that the proof would show that Laramore "was shot . . . not once, not twice, but three separate times" (100)).

Likewise, while petitioner's decision to testify made his credibility the appropriate focus of the prosecutor's summation, it did not permit the prosecutor to demean petitioner's word as "lowly" because of his status as a criminal defendant, or to compare petitioner's trial assertions to a near-expletive.

---

[3] It was also probably confusing to jurors because, when the prosecution sought to continue its questioning of Dr. Okadigwe over the defense objection that it was duplicative of Becker's testimony, the Court allowed noted that "a doctor is at a whole different level than an EMT" (313).

Nevertheless, we conclude that the Appellate Division's rejection of petitioner's "largely unpreserved" prosecutorial misconduct claim on the merits was not contrary to or an unreasonable application of Donnelly or Darden within the meaning of 28 U.S.C. §2254(d). See Carey v. Musladin, 549 U.S. 70, 74 (2006); Williams v Taylor, 529 U.S. 362, 412 (2000); Rodriguez v. Miller, 537 F.3d 102, 109 (2d Cir. 2008). However undesirable some of the prosecutor's comments may have been, it is not unreasonable for the Appellate Division to have concluded that these comments did not deny petitioner a fair trial.

First, any ill effects of these remarks were mitigated, even if not entirely cured, by the trial court's instructions to the jury, which properly advised them that what lawyers say to them during argument is just that—argument and not evidence—and that it is the *jurors'* recollection of the evidence, and not that of counsel, that governs (668-89). Second, we are convinced that petitioner would have been convicted absent the undesirable prosecutorial remarks. There was overwhelming evidence, independent of those remarks and of whatever the victim's back wound may have signified, from which a reasonable juror could have rejected the claim of self-defense beyond a reasonable doubt, including the victim's account, the corroborating testimony of the eyewitnesses, the unrefuted testimony that petitioner's girlfriend had been harassed by the Laramores, and the backdrop of turbulent relations between the two families. Further, having witnessed petitioner's demeanor on the witness stand and throughout the trial, it was not unreasonable for the jury to have rejected his assertions of happenstance as incredible.

## II.    The Perjury Claim

Highlighting a discrepancy between Laramore's trial and grand jury testimony on the nature of his back wound, petitioner claims that the prosecutor knowingly suborned perjury from

Laramore. Although at trial, Laramore testified that petitioner "shot [him] in the chest *and* . . . in the back," which conformed to the state's trial theory, he did testify differently before the grand jury:

> Q. Where did you get shot?
> A. In the chest and stomach inside the back, went out the back
> Q. There was an exit wound in your back, bullet exit wound?
> A. Yes.

See Gr. Jury Minutes, p. 24, Ex. E to Petitioner's C.P.L. §440 Motion, October 25, 2007.

The Supreme Court has recognized that a conviction obtained through the "deliberate deception of court and jury by the presentation of testimony known to be perjured" violates due process. Mooney v. Holohan, 294 U.S. 103, 112 (1935). Summarizing the "clearly established Federal law" on perjury claims for section 2254(d)(1) purposes, the Second Circuit explained that a habeas court "must ask (1) whether false testimony was introduced, (2) whether that testimony was or should have been known to the prosecution to be false, [and] (3) whether the testimony went uncorrected." Shih Wei Su v. Filion, 335 F.3d 119, 127 (2d Cir. 2003) (citing Mooney v. Holohan, United States v. Agurs, 427 U.S. 97 (1976), and Giglio v. United States, 405 U.S. 150 (1972)). If we answer all these questions in the affirmative, we are then to presume prejudice unless there is "no reasonable likelihood that the false testimony could have affected the judgement of the jury." Agurs, 427 U.S. at 103.

We conclude that the Appellate Division's rejection of petitioner's perjury claim was neither contrary to nor an unreasonable application of these Supreme Court authorities.[4]

---

[4] Although we treat the perjury claim here separately, petitioner raised it on direct appeal as part of the prosecutorial misconduct claim that the Appellate Division rejected on the merits. People v. Doran, 10 A.D.3d at 425.

Although the Appellate Division did not delineate perjury-specific reasoning, it could have soundly resolved the issue at the threshold stage by concluding, within the meaning of Shih Wei Su, that no "false testimony was introduced." Id., 335 F.3d at 127. First, the mere existence of a discrepancy between the victim's two descriptions of his back injury does not ipso facto establish that either was necessarily false. More fundamentally, the challenged testimony could not be perjurious because the nature of the wound on Laramore's back was not a subject that Laramore could have sworn to, truthfully or falsely, as a fact; that is, his "knowledge" of the kind of wound manifest on his back must reflect only what he was told by the medical professionals who treated him, and not any diagnosis he himself made.[5] Even petitioner acknowledges as much: during the state's cross-examination of him, he recounted Laramore's grand jury testimony:

> Q      How many times did [Laramore] get hit?
> A.     He got hit one time.
> Q.     You know that now?
> Q.     Because  I read the statements at the grand jury minutes where you asked him how many times he got shot, and he told you he got shot twice in the chest, and you asked him about his back and you asked him was it an exit wound and he sais yes.
> Q.     He knows it was an exit wound?
> A.     *I assume so, the doctors told him* (552) (emphasis added)

Furthermore, because the jury heard directly from EMT Becker and Dr. Okadigwe on the the nature of the back wound, it is not an unreasonable application of Agurs to find "no reasonable likelihood" that Laramore's testimony on the subject, even if susceptible of being declared false, "could have affected the judgment of the jury." Id., 427 U.S. at 103.

---

[5] Laramore understandably admitted that the rapid-fire nature of the shooting left him with a scant recollection of the particulars. He testified that he remembered "[n]othing, really" of what occurred after the third shot (204), that he had "no idea" how he got to the hospital, that he "wouldn't know" if he was conscious, that he remained at the hospital for "like a month and a week," and that much of the time he was there, he "felt nothing, really" (205).

-10-

**III.     The Ineffective Assistance of Trial Counsel Claim**

A.      <u>The IAC Grounds Asserted on Direct Appeal</u>

The gravamen of petitioner's IAC claim is that trial counsel failed to mount a sufficiently vigorous opposition to the various instances of prosecutorial misconduct. Petitioner further asserts that the alleged deficiency in counsel's performance was essentially decreed the moment that the trial court denial his lawyer's pre-trial request to be relieved on ethical grounds. Defense counsel informed the court:

> Without being too specific it's clear to me that it's my view, and I think [petitioner] agrees with me, he has to testify at this trial to effectively put on a defense . . .as I said, under the canons of ethics, a situation has arisen that makes me say what I'm about to say. . . It is clear to me based on discussions with [petitioner] that some or all of his testimony is going to be of such a nature that it would prevent me, as I understand the canon of ethics from effectively representing him and he would be without effective assistance of counsel (H. 7).[6]

The trial judge asked specifically whether counsel's concern "has to do with [his] client's testimony," counsel replied, "yes," and the court explained that petitioner "can get up and say what happened. Let him tell a story. Whatever he wants to say . . . it's his business, not yours." Counsel reiterated that "certain things [petitioner] told [him]" made him believe that he "cannot assist him in his testimony" or "even comment on [it in] summation, which effectively would destroy [his] effectiveness as [petitioner's] attorney" (H. 8). The court concluded, however, that even if counsel was concerned that "some of [petitioner's] testimony may not be totally truthful," the court would not relieve counsel because "if it was unethical for [him] to do it, it's unethical for any attorney to do it," which, the trial court stated, meant that "it shouldn't be done" but not that counsel should be relieved (H. 9).

---

[6] "H" refers to pages from the transcript of the pre-trial hearing.

The Appellate Division rejected these grounds on the merits as part of petitioner's "remaining claims" found to be "without merit," People v. Doran, 10 A.D.3d at 425, and that rejection, we find, was not contrary to or an unreasonable application of controlling Supreme Court law. See Strickland v. Washington, 466 U.S. 668, 688 (1984) (to demonstrate constitutionally ineffective assistance of counsel, petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and that petitioner was prejudiced as a result).

On the principal branch of petitioner's claim, our conclusion that the prosecutor's improprieties did not affect the verdict forecloses a showing of Strickland prejudice.

On the conflict-based argument, there is no authority for petitioner's categorical assertion that the court's denial of his attorney's request to be relieved ipso facto rendered his counsel ineffective. Assuming arguendo that some actual conflict of interest could be shown, petitioner would also have to show that the conflict adversely affected his defense. Mickens v. Taylor, 535 U.S. 162, 167-73 (2002) (holding that Supreme Court's conflict jurisprudence does not create exception to Strickland prejudice requirement). This he cannot do.

Whatever concerned counsel during the pre-trial hearing about petitioner's eventual trial testimony did not, in the end, stand in the way of petitioner offering that testimony or counsel advocating the claim of self-defense. Petitioner *did* testify on his own behalf, and not in an undirected, unquestioned narrative but through the guiding hand of counsel, who led him through a detailed direct examination, voiced objections during the state's cross-examination, and delivered a forceful summation that tracked petitioner's testimony. Counsel also conducted a vigorous cross-examination of the Laramore eyewitnesses that exposed inconsistencies in their

accounts, their criminal backgrounds, and the obvious interest they had in speaking as one when testifying that the victim was unarmed. It was also petitioner's counsel who elicited that Dr. Okadigwe could not tell whether the injury on the victim's back was an entry or exit wound. In sum, plaintiff has not shown that he was prejudiced by counsel's pre-trial ethical concerns.

B.     The Two Additional Ineffectiveness Grounds

Petitioner expanded his ineffectiveness claim in a post-appeal motion to vacate pursuant to C.P.L. §440.10. The motion was still pending at the time he filed this petition, we awaited its resolution and, through counsel for respondent, have now been furnished with the trial court's decision on that motion, which rejects the enlarged ineffectiveness claim on the ground that it was largely "raised before, and rejected by, the Appellate Division." People v. Doran, Ind. No. 419/01, slip op. at 2-3 (Sup. Ct. Kings. Co. March 20, 2008).[7] Petitioner then moved to reargue his 440 motion, spelling out the ways in which the trial IAC claim in his 440 motion differed from the one raised on direct appeal and arguing that the new grounds were based on matters outside the record and therefore proper on a 440 motion. The trial court denied the motion to reargue, concluding again that the claims "raised in the . . . 440 motions were raised before, and rejected by, the Appellate Division." People v. Doran, Ind. No. 419/01, slip op. at 2 (Sup. Ct. Kings. Co. Sept. 8, 2008).

While the trial court understandably rejected what appear at first blush to be hairsplitting differences between the IAC grounds asserted in the appellate and 440 courts, we recognize in the 440 papers two grounds raised for the first time that require brief attention: the allegation that

---

[7] The Appellate Division denied leave to appeal. People v. Doran, 2008-03833 (June 10, 2008).

counsel failed to impeach Laramore with his grand jury testimony about his back wound because he had not reviewed the grand jury minutes, and a broad assertion that "counsel failed to investigate the facts of the case, and adequately develop the justification defense that he presented at trial." Pet'r Aff. in Support of Mot. to Reargue, April 6, 2008. Petitioner amplifies the latter assertion in a letter addressed to counsel, included as an exhibit to the state court motions, in which he asks counsel, "why [he] did not interview Tamika Baker, Roxanne Baker, or any other witnesses who could have possibly supported [petitioner's] claim of self-defense at trial." Exhibit 1 to 440 Motion.

We take note of these grounds as a distinct claim for two reasons. First, in the abstract, they are not frivolous. See, e.g., Espinal v. Bennett, 588 F. Supp.2d 388 (2d Cir. 2008) (Trager, J.) (counsel's failure to investigate a report that could have corroborated defendant's alibi and decision not to cross-examine witness based on prior inconsistent statement together establish IAC warranting habeas relief), aff'd, 2009 WL 2501934 (2d Cir. Aug 18, 2009). Second, we have nothing from the attorney himself or respondent that would enable us to conclude with confidence that the alleged deficiencies either lack a factual basis or were matters of strategy.[8] See Sparman v. Edwards, 154 F.3d 51, 52 (2d Cir. 1998) ("a district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form

---

[8] Petitioner's 440 motion papers includes copies of two letters, addressed to trial counsel, in which petitioner requests an affirmation "answering" specific questions that relate to the IAC claims. Petitioner has not submitted an affidavit of service or other proof that these letters were actually mailed, but in any event, counsel did not submit a statement, either through petitioner or as part of respondent's opposition to the 440 motions. In addition, that opposition addresses only procedural concerns but does not address the merits of the newly raised grounds.

of live testimony, affidavits, or briefs").[9]

Accordingly, assuming without deciding (a) that there exists a factual basis for petitioner's allegation that his counsel failed to review the victim's grand jury testimony and failed to interview members of the Baker family who also witnessed the shooting, and (b) that these assumed omission "f[a]ll below the objective standard of reasonableness" for purposes of Strickland's first prong, we proceed to consider whether petitioner could establish Strickland prejudice. To do so, he "must show more than that the unprofessional performance merely 'had some conceivable effect.'" Strickland, 466 U.S. at 693 (internal citation omitted). Rather, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

While the deficiencies of counsel assumed here arguably could have had "some conceivable effect" in a case such as this, which turned on competing claims of credibility, they do not undermine our confidence in the verdict. In all likelihood, the impeachment of Laramore that petitioner envisions would have only helped the prosecution by prolonging the victim's sympathy-inducing account of his traumatic experience and injuries and by affording him an opportunity to explain away the inconsistency as a product of that trauma. It would have also shifted the focus away from the medical testimony on the question, which was, despite the prosecution's arguments, consistent with petitioner's claim that he shot his victim only once.

---

[9] *If* petitioner's claims were that counsel *had reviewed*, but then elected not to use the grand jury minutes, and that counsel *had interviewed*, but then elected not to call other Bakers as trial witnesses, we would proceed no further; both decisions would be sound matters of trial strategy that could not form the basis for an IAC claim.

The testimony from Baker family members that petitioner envisions would like have been as assailable (on the grounds of bias) as that of the Laramores and thus, while theoretically corroborative, would not likely have given petitioner's facially suspect account of fortuity a materially greater jury appeal. It would also have stripped defense counsel of that bias-based attack on the credibility of the Laramores. (Had petitioner, by contrast, accused his lawyer of failing to interview the "friend" to whom he claims he was about to return the gun, the analysis here might be different).

### IV. Ineffective Assistance of Appellate Counsel

In a final claim unrelated to the bullet evidence, petitioner faults his appellate attorney for failing to pursue on appeal petitioner's claim that he was denied counsel during the investigatory line-ups.

A defendant, of course, has no federal constitutional right to counsel at a lineup that occurs before the initiation of adversary judicial criminal proceedings. Kirby v. Illinois, 406 U.S. 682, 689-90 (1972). New York law, however, recognizes a right to counsel during the investigatory phase "when a defendant in custody, already represented by counsel on an unrelated case, invokes the right by requesting his or her attorney." People v. Mitchell, 2 N.Y.3d 272, 274 (2004).[10] A request for counsel "invokes" the right only if that request is "unequivocal." Id. at 276. "Once the right to counsel has been triggered, the police may not proceed with the lineup without at least apprising the defendant's lawyer of the situation and affording the lawyer a

---

[10] The right also exists "when counsel has actually entered the matter under investigation." Mitchell, 2 N.Y.3d at 274.

reasonable opportunity to appear." Id., at 274-75. "A specific request that the lineup not proceed until counsel is so notified need not be made." Id., at 275. If counsel has been unequivocally requested and nevertheless excluded from the lineup, a new trial preceded by an independent source hearing is required, but only if the lineup in question produced the only identification evidence at trial. People v. Wilson, 89 N.Y.2d 754 (1997).

Petitioner, claiming that police ignored his request for counsel during his line-up, moved pre-trial to suppress the line-up identifications. It is undisputed that at the time of the line-up, petitioner had another, unrelated mater pending in Schenectady, New York, that he was represented in that matter by Peter Verby, and that the line-up was conducted in Verby's absence. (Verby did represent petitioner at the suppression hearing and trial in this matter). The only question before the hearing court was whether petitioner unequivocally invoked his right to counsel within the meaning of Mitchell and Wilson.

Detective Alegria, who conducted the line-up, testified that he was aware at the time that Verby was representing petitioner in the Schenectady matter; indeed, Alegria testified that it was for that reason that he did not question petitioner about the Laramore shooting (H. 68-70). Nonetheless, Alegria did not contact Verby before conducting the line-up because petitioner did not ask for Verby; petitioner also made several remarks that Alegria understood as expressing dissatisfaction with the quality of Verby's representation (H. 70-71). Petitioner, however, testified that he "asked [Alegria] for an attorney," but also admitted that he never asked for Verby by name (H. 74-76). Petitioner also admitted that he told Alegria that one of the reasons he had not turned himself in for the Laramore shooting was that "he didn't have money for Johnny Cochran" (H. 75).

The hearing court denied the suppression motion, finding that petitioner's testimony on direct was inconsistent with his testimony on cross-examination, that Alegria's testimony was more credible than petitioner's, and that petitioner had therefore not properly invoked his right to counsel (H. 89). The court further found that the line-ups themselves were fair and non-suggestive (H. 89).

In an application for a writ of error coram nobis, petitioner claimed that he was denied the effective assistance of appellate counsel because his appellate lawyer did not purse the line-up counsel claim. The Appellate Division denied the application on the merits. People v. Doran, 27 A.D.3d 480 (2d Dep't 2006) (petitioner "has failed to establish that he was denied the effective assistance of counsel") (internal citations omitted). The Court of Appeals then denied leave to appeal. People v. Doran, 7 N.Y.3d 755 (June 14, 2006).

We readily conclude that the state courts' rejection of petitioner's appellate IAC claim is not an contrary to or an unreasonable application of controlling Supreme Court law, which on an appellate IAC claim includes not just Strickland but also Jones v. Barnes, 463 U.S. 745 (1983). Jones squarely holds that appellate counsel has no "constitutional duty to raise every nonfrivolous issue requested by a defendant, id., 463 U.S. at 747, and recognizes that "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Id. at 751-52.

On the record before her, petitioner's appellate counsel had good reason to elect not to purse the lineup counsel claim in addition to or in lieu of the four substantive claims she did brief (prosecutorial misconduct, trial counsel's effectiveness, the Sandoval ruling, and the sentence).

Petitioner was plainly waffling during his testimony at the suppression hearing, so counsel had no reason to believe the Appellate Division would overturn the hearing court's credibility-based determination that petitioner had failed to invoke his pre-indictment right to counsel. See People v Mitchell, 2 N.Y.3d at 276 (where "remarks are consistent with a variety of interpretations, we cannot conclude that suppression court erred as a matter of law in finding that [defendant's mother] did not unequivocally invoke" right to counsel).

## CONCLUSION

For the foregoing reasons, the application is denied and the petition is dismissed. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability shall not issue. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. Coppedge v. United States, 369 U.S. 438 (1962). The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
October 20, 2009

s/ Judge Raymond J. Dearie
_____
RAYMOND J. DEARIE
United States District Judge